# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| ROGER TWILLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CV-33-TS |
| | ) | |
| INTERNATIONAL BEDDING CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on Defendant International Bedding Corporation's (IBC) Motion for Summary Judgment on Roger Twilley's Claims [DE 37]. The Plaintiff, Roger Twilley, alleges that his former employer, IBC, retaliated against him after he engaged in conduct protected by Title VII of the Civil Rights Act of 1964 and by the Fair Labor Standards Act (FLSA). The Defendant maintains that the undisputed material facts show that the Plaintiff is not entitled to recover for retaliation because he cannot establish that there was a causal connection between his protected expression and an adverse employment action, that he was meeting his employer's legitimate expectations, that similarly situated employees who did not engage in protected activity were treated more favorably, or that the Defendant's non-retaliatory reasons for taking the adverse actions were a pretext for retaliation.

## PROCEDURAL BACKGROUND

On November 5, 2008, the EEOC issued the Plaintiff a Notice of Rights to Sue. On February 4, 2009, the Plaintiff, proceeding *pro se*, filed an Employment Discrimination Complaint. He alleged that the Defendant retaliated against him for providing a witness

statement on behalf of a former employee, and for opting to participate in a class action lawsuit involving claims of unpaid wages. In his Complaint, the Plaintiff asserts that the Defendant fired him in violation of the employee handbook and without cause.[1] On March 18, the Defendant answered the Complaint, denying all allegations of wrongdoing.

On December 11, the Defendant moved for summary judgment, filing a Motion [DE 37] a Statement of Undisputed Material Facts [DE 38-2], affidavits and depositions [DE 38], and a Memorandum in Support [DE 39]. Because the Plaintiff is proceeding *pro se*, the Defendant also provided a Notice [DE 36] to the Plaintiff to advise him that it was filing a motion for summary judgment and of his obligation to respond, particularly with his own sworn affidavit or other documentary evidence. *See* N.D. Ind. L.R. 56.1(e).

On February 3, 2010, the Plaintiff filed his response to the Motion for Summary Judgment. It consists of an unsworn statement, time cards, excerpts of the Defendant's discovery responses, and argument in response to the Defendant's designated evidence.

On February 19, the Defendant filed its Reply Brief, noting that the Plaintiff's Response was deficient under the Rules governing summary judgment submissions. The Defendant argues that, even if these deficiencies were ignored, the Plaintiff had failed to refute the Defendant's legitimate and honestly held reasons for taking the employment actions at issue.

**SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure provide that motions for summary judgment should

---

[1] The Defendant's summary judgment briefing acknowledges that the Plaintiff also claims that his hours were reduced in retaliation for participating in the class action lawsuit. This claim was not presented in the Plaintiff's Complaint, but came to light during discovery.

be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party opposing the motion "may not rest upon the mere allegations or denials contained in their pleadings; instead, it is incumbent upon them to introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial." *Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 675 (7th Cir. 2006).

## STATEMENT OF FACTS

The Defendant's Statement of Undisputed Material Facts provides the pertinent facts of this case. In accordance with the local rules governing summary judgment submissions, the facts are supported by citations to depositions, affidavits, and other admissible evidence. N. D. Ind. L.R. 56.1(a). The Plaintiff, in response, was required to "file any affidavits or other documentary material controverting the movant's position, together with a response" that includes "a

'Statement of Genuine Issues' setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." *Id.* Additionally, the Court is to "assume that the facts claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent such facts are controverted in a 'Statement of Genuine Issues' filed in opposition to the motion" and supported by admissible evidence. N.D. Ind. L.R. 56.1(b). The Plaintiff has failed to submit a Statement of Genuine Issues, or to properly designate facts to dispute the Defendant's statement of facts. It is thus proper for the Court to assume that the facts presented by the Defendant and supported by admissible evidence are admitted to exist without controversy. To the extent the Plaintiff disagrees with the inferences and implications of certain facts as they relate to his retaliation claim, the Court will address these arguments in the analysis section of this Opinion. In accordance with the Rules applicable to summary judgment motions, the Court will analyze the Plaintiff's retaliation claim using the following undisputed facts:

**A.      IBC's New Haven Factory**

IBC is an independently owned bedding manufacturing corporation with a factory in New Haven, Indiana. IBC's customers include furniture stores, national bedding chains, the United States military, wholesale distributors, and the hospitality industry.

The production schedule at the New Haven plant is dependent upon the number of orders the plant receives. Because the plant does not stock a large quantity of inventory, the production team processes orders as they are received. Production involves four cycles: (1) quilting; (2)

sewing; (3) matt building; and (4) shipping. After an order is received, the Quilting Department produces mattress coverings that are sent to the Sewing Department. The Sewing Department completes the construction of the covers, and the Matt Build Department then assembles the raw materials to create the mattresses for market. Assembled mattresses are sent to the Shipping Department where they are put into bags and boxes, then moved to the loading docks for shipment. Some days, employees in the Matt Build and Shipping Departments are released early by their supervisors because all the work in their department is complete.

Joey Sams ("Sams") is the Operations Manager at the IBC plant in New Haven, Indiana. Ivan Valentour ("Valentour") the Production Manager at the IBC New Haven facility, is the supervisor of all production employees in all departments. The Leadman for the Matt Build Department, Rafael Lopez ("R. Lopez"), has authority to coordinate, direct, and assign the workers in the Matt Build Department. Rose Nino ("Nino") is the supervisor of the shipping Department and has authority to coordinate, direct, and assign the workers in the Shipping Department. Sams, Valentour and the supervisor of the specific department in which an employee is working are the only people who have the authority to allow an employee to leave early.

The Matt Build Department is organized around an assembly line that has seven divisions. Partially completed materials pass through the line until they reach the Shipping Department. Any problems or decrease in production in the assembly line causes the entire line to slow down or, in some cases, shut down until the completed mattresses are available for bagging and shipping. The number of beds an employee is able to make in a day is the most important performance criterion in the Matt Build Department. Most Matt Builders assemble

5

between one hundred and one hundred ten beds per shift. In three of the Matt Build Department divisions, the employees are compensated per hour and with a bonus incentive for every mattress completed. These employees are required to submit "build tickets" from each mattress they complete. Bonuses are calculated strictly on the number of tickets submitted by each employee, and the tickets are also used by IBC's corporate office to calculate and record data.

**B.     The Plaintiff's Employment and Termination From Employment**

On May 17, 2000, IBC hired the Plaintiff as a full time Matt Builder. The Plaintiff understood that R. Lopez was the Leadman of the Matt Build Department and Valentour was a Manager above him. If the Plaintiff had to leave work early, he talked to R. Lopez or to both R. Lopez and Valentour. If he needed to take a day off, he informed Valentour.

In December 2005, IBC terminated another employee, Latoya Lopez ("L. Lopez"), for abandoning her job and leaving the plant without permission before the end of her shift. On January 30, 2006, L. Lopez filed a Charge of Discrimination against IBC with regard to her termination of employment, and on September 6, 2006, she filed a federal lawsuit. On March 14, 2007, the Plaintiff prepared the following written statement regarding his recollection of the events preceding L. Lopez's termination: "On 12-12-05 on my way to the time clock I was approached by Patty Ellis. She wanted me to tell Latoya if she left she would be (terminated). When Patty Ellis and I got to the time clock[,] Latoya was already there. Patty Ellis then informed Latoya if she left she would be (terminated)." (Twilley Dep., Ex. 14.)[2]

---

[2] At some point prior to December 2005, Twilley had became romantically involved with L. Lopez. Management at the New Haven plant was aware of the relationship.

On August 31, 2006, Rigoberto Herrejon Guerrero ("Guerrero") filed a Wage and Hour Complaint against IBC in the United States District Court, for the Middle District of Pennsylvania ("the class action"). On May 8, 2007, the Pennsylvania District Court issued an order permitting Guerrero to issue Opt-In Consent forms to all IBC employees. On May 27, 2007, the Plaintiff signed an Opt-In Consent form and joined the class action as a plaintiff. In July or August 2007, during a general conversation, the Plaintiff told Valentour that he had joined the class action. He told Sams that he was involved in the class action on January 30, 2008. The Plaintiff alleges that two months after he joined the class action, in mid-August 2007, IBC began to retaliate against him by reducing his hours.

In July 2006, IBC lost one of its biggest accounts, Big Lots, which accounted for between forty to seventy percent of IBC's production. After IBC lost the Big Lots account, the entire Matt Build Department lost production hours. In addition, IBC experienced an overall decline in customer orders and production during the later part of 2006 and throughout 2007, due in part to the downturn in the economy. Even before January 2007, the Plaintiff had fewer hours than each of the other employees in the Matt Build department. The time clock reports for the Matt Builders who worked from January 2007 through July 2007 reflect that the Plaintiff worked 1,147.7 hours; Raul Moreno worked 1,747.75 hours; Raul Lopez worked 1,598.25 hours and Grady Granados worked 1,482.25 hours. Between August 2007 and January 2008, the Plaintiff worked 827.25 hours; Raul Moreno worked 1,243.75 hours; Raul Lopez worked 1277.25 hours; and Grady Granados worked 1,256.5 hours.

In 2007, the Plaintiff's output progressively declined from 100 to 105 beds per shift to between 30 and 40 beds during the last months of 2007. The Plaintiff's co-workers were still

7

producing between 100 and 110 beds in the same amount of time.[3] Valentour believed that the Plaintiff held up the production line several times by working more slowly than was required to build a mattress. For example, on one occasion he saw the Plaintiff working slower on the mattresses in front of him so that he could avoid constructing the king size mattresses that were next on the assembly line. Valentour talked to the Plaintiff several times about his decreased production. The Plaintiff said he would try to improve, but then continued to work slower than what Valentour believed the Plaintiff was capable of doing, and appeared to be making no efforts to increase his production rates.

Additionally, in the later months of 2007 and early January 2008, the Plaintiff frequently failed to turn in his build tickets from finished mattresses. Valentour and R. Lopez repeatedly addressed with the Plaintiff the requirement to submit the build tickets. Valentour contends that, prior in January 2008, he gave the Plaintiff a verbal warning for his failure to submit the incentive tickets from the beds he produced, but that the Plaintiff refused to sign it. The Plaintiff disputes that he received a verbal written warning. On January 29, 2008, Valentour issued the Plaintiff an employee warning for his repeated failure to submit the build tickets. When Valentour talked to the Plaintiff about the build tickets, the Plaintiff complained that he was not getting enough hours. Valentour explained to the Plaintiff that he would be making more money (from bonuses) if he submitted his build tickets.

In January 2008, Valentour and Sams discussed the Plaintiff's performance. They agreed

---

[3] Valentour was able to calculate the number of mattresses each employee makes per day because every day the plant had a set number of mattresses to produce (based on the orders received either the day before or two days before) and each employee was required to submit build tickets from the mattresses they completed. The Plaintiff was not turning in build tickets, so Valentour calculated the Plaintiff's production rate by subtracting the production rates of the other employees (who submitted build tickets) from the total order.

8

to transfer the Plaintiff from the Matt Builder position to a non-production position within the same department. He would be compensated only for the hours worked, with no potential for incentive pay. Valentour remained the Plaintiff's supervisor and R. Lopez remained the Leadman. The Plaintiff began working in his new position during the last week of January 2008.

On Monday February 4, 2008, the Plaintiff reported to work at 7:00 a.m. and, because the orders for the day had been processed by his department by 2:00 p.m., clocked out at 2:00 p.m. On Tuesday February 5, the Plaintiff again reported to work by 7:00 a.m. and worked in his area until his was told he could leave, shortly after 11:00 a.m. On Wednesday February 6, the Plaintiff reported to work by 7:00 a.m. and worked until his lunch break. After his lunch break he returned to his area within the Build Department until about 12:30, at which time R. Lopez instructed him to go to the Shipping Department and assist Nino and her department with packaging the completed beds, an area in which the Plaintiff was crossed-trained and subject to transfer based upon production needs. The Plaintiff maintains that when R. Lopez told him to help Nino in the Shipping Department, he also told him to leave at 2:00 p.m. The Plaintiff and another worker from his area in the Matt Build Department, Jose Reducindo ("Reducindo"), went to the Shipping Department. From 12:30 p.m. to 2:00 p.m., the Plaintiff and Reducindo worked under Nino's supervision packaging beds in the Shipping Department. The size, weight, and dimensions of a mattress required that they work together; packaging was a two-person job. When the Plaintiff and the other employees left the production floor at 2:00 p.m. for their scheduled afternoon break, there were still about 200 mattresses in the Shipping Department that needed to be packaged.

At around 2:11 p.m., Reducindo returned to the Shipping Department to continue the

work. The Plaintiff did not return, and Nino and Valentour did not know where he was. They searched for the Plaintiff in and around the plant. By 2:30 p.m., the Plaintiff had not been located and Valentour told Nino to find another employee to assist Reducindo in packaging the remaining 200 mattresses.

The Plaintiff did not tell Nino or Valentour on February 6, 2008, that he was leaving the facility. Valentour immediately talked to R. Lopez and learned that, after 12:40 p.m., R. Lopez sent the Plaintiff to help package mattresses in the Shipping Department. Nino told Valentour that she acquired the Plaintiff after 12:30 to work in the Shipping Department and all employees, including the Plaintiff, were expected to stay until the line was clear and all beds had been packaged and sent out for shipment. Nino told Valentour that the Plaintiff did not return after the 2:00 p.m. work break and that he abandoned his job. Valentour decided to terminate the Plaintiff's employment, and he was the sole decision-maker regarding the termination. The Plaintiff believes that lack of communication between R. Lopez, Nino, and Valentour created a misunderstanding, and that he was told by R. Lopez to leave at 2:00 p.m.

The next day, February 7, the Plaintiff drove onto the parking lot at IBC shortly before 7:00 a.m. Valentour met him in the parking lot and told him that IBC terminated his employment because the previous day he failed to return to work after the 2:00 p.m. break, and that he was considered to have abandoned his job. The Plaintiff stated in his deposition that he does not know if Valentour believed that the Plaintiff abandoned his job on February 6, 2008. (Twilley Dep. 151–52.) He also admitted that if Valentour believed Twilley had walked off the job, it would have been appropriate for Valentour to terminate his employment. (Twilley Dep. 152.) Prior to February 2008, IBC had terminated other employees, including L. Lopez and two male

employees, for walking off the job or failing to return to work after a break when there was still work to be done.

**C.     IBC's Employee Handbook**

IBC publishes an Employee Handbook and distributes a copy to all employees, who sign an acknowledgement form reflecting their receipt of the Employee Handbook. On May 15, 2006, the Plaintiff signed an acknowledgement that he received, read and understood IBC's Handbook policies. The Employee Handbook notifies employees of the possibility of transfer to another job within the facility:

> Work assignments.  It is the Company's intent that you are assigned to a regular job.  However, circumstances occur which may make it necessary to transfer you to other jobs. In order to keep the operation running smoothly, safely and efficiently, the Company reserves the right to transfer an employee to another job assignment, whether temporarily or permanently, at any time.

(Twilley Dep. Ex. 20, p.2.) The Employee Handbook also discussed IBC's attendance policy:

> Absence is the failure to report for work or to remain at work as scheduled.  It includes late arrivals and early departures, as well as absence for an entire day . . . Your regular and punctual attendance is essential for the efficient operation of the Company . . . anyone arriving after the designated start time, or departing before the designated quitting time, may be subject to disciplinary measures.

(Twilley Dep., Ex. 20, p. 5.) An Employee Conduct policy, also published in the Employee Handbook, states that "[e]mployees may be disciplined or terminated for poor job performance, including but not limited to . . . failure to give proper notice when unable to report for or continue work as scheduled." (Twilley Dep., Ex. 20, p.7.) The Plaintiff stated that he was aware of the policies concerning attendance and giving proper notice when unable to continue work as scheduled.

**DISCUSSION**

The Plaintiff alleges that IBC retaliated against him because he: (1) provided a written witness statement in the L. Lopez matter; and (2) joined the class action. The Plaintiff alleges that his hours were reduced in retaliation for opting into the class action, and that he was terminated from his employment in retaliation for providing the statement and for opting into a class action. The Defendant submits that the Plaintiff's hours were reduced because demand for its product had decreased and his performance was significantly below average, both as previously maintained by the Plaintiff himself and as measured against his co-workers. The Defendant maintains that the Plaintiff's termination from employment was for the non-retaliatory reason that he walked off the job without notice or approval.

Title VII forbids employer retaliation where an employee "has opposed any practice made an unlawful employment practice" by Title VII or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (holding that unlawful retaliation occurs under Title VII when an employer takes action that discriminates against an employee because he has opposed a practice that Title VII forbids). The FLSA provides private remedies for employees who have suffered adverse employment actions as a result of engaging in certain protected activities. 29 U.S.C. § 215(a)(3) (providing that it is unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding").

Under these statutes, the Plaintiff may prove retaliation using either the direct or indirect method of proof. *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (Title VII); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005) (FLSA). "Evidence of retaliation is 'direct' when, if believed, it would prove the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). The Plaintiff does not present any evidence that constitutes direct evidence of retaliation because "[t]iming alone is insufficient to establish a genuine issue of material fact to support a retaliation claim," *Brown v. Ill. Dep't of Nat'l Res.*, 499 F.3d 675, 685 (7th Cir. 2007) (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007)), and the Plaintiff has not presented any evidence that would otherwise establish a causal connection between his protected activity and his reduction in hours or termination from employment. Therefore, he must proceed under the indirect method of proof familiar under the burden-shifting framework prescribed by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), as adapted for use in the context of retaliation claims. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). To establish a prima facie case of retaliation under the indirect method, the Plaintiff must show that he (1) engaged in statutorily protected activity; (2) suffered a materially adverse action; (3) met his employer's legitimate expectations, i.e., was performing his job satisfactorily; and (4) was treated less favorably than some similarly situated employee who did not engage in statutorily protected activity. *Argyropoulos*, 539 F.3d at 733. "[F]ailure to establish any one element of the prima facie case is fatal to an employee's retaliation claim." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)). But if the employee establishes a prima facie case, the burden shifts to the

employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the employee to demonstrate that the employer's reason is pretextual. *Id.* Summary judgment for the defendant is proper if the employee fails to establish pretext. *Id.*

For purposes of summary judgment, the Defendant does not dispute that the Plaintiff has satisfied the first two elements of a prima facie retaliation case. However, for each of the claimed adverse employment actions, the Defendant argues that the Plaintiff has not presented any facts that would establish he was meeting his employer's legitimate expectations, or that other similarly-situated employees who did not engage in statutorily protected activity were treated more favorably.

**A.      Reduction in Hours**

The Defendant argues that the Plaintiff was not performing his job satisfactorily, and was, in fact, the least productive Matt Builder in the Matt Build Department. The Plaintiff has not presented any evidence to dispute the Defendant's evidence that his production rate dropped throughout 2007, so that by the end of 2007 he was building only 30 to 40 mattresses a day. In the past, he was able to build at least 100 mattresses a day, a pace that his co-workers continued to keep. The Plaintiff also was not consistently and timely turning in build tickets. Without the tickets, the Defendant could not determine incentive pay or track the number of mattresses the Plaintiff built (except by subtracting the number of tickets submitted by other employees from the total number of mattresses built). Valentour believed, from his observation, that the Plaintiff purposely worked slowing on one occasion to avoid assembling the king mattresses that were

coming down the assembly line. The Plaintiff has not satisfied the third prong of a prima facie case—that he was meeting his employer's legitimate job expectations and performing his job satisfactorily.

Additionally, the Plaintiff cannot point to any similarly-situated employee who was treated better. Employee's hours at the Defendant's factory fluctuate depending on the number of orders the plant receives. The Defendant asserts that as demand for its product decreased, it reduced the hours for all Matt Builders but still assigned the most hours to employees who were more productive than the Plaintiff. To prove that the Defendant retaliated against him in the manner it assigned hours, the Plaintiff must point to an employee with a "comparable set of failings." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642–43 (7th Cir. 2008) (quoting *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003)); *see also Herron v. Daimler Chrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (requiring proof of someone "directly comparable" to plaintiff "in all material respects"). In other words, the Plaintiff must show that the other employee "is similarly situated with respect to performance, qualifications and conduct." *Ezel v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005). This normally requires proof that the "two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 1049–50 (quotation omitted). The Plaintiff has not made any attempt to identify another employee with a similar production record. He simply points out that he was sent home early more often after he became a plaintiff in the class action suit, and that he was sent home early more often than his co-workers in the same department. However, these facts, which are not in dispute, go to the first

15

two elements of a prima facie case, and a plaintiff must satisfy all the elements of a prima facie case to move forward with his claim.

The Plaintiff has not presented prima facie proof that his reduction in hours was an act of retaliation for joining a class action lawsuit, and the Defendant is entitled to summary judgment on this claim.

**B.     February 6, 2008, Discharge from Employment**

Regarding his claim for retaliatory discharge, the Defendant has presented evidence that on the day of his termination, February 6, 2008, the Plaintiff was assigned by his supervisor in the Matt Build Department to work in the Shipping Department. He worked in the Shipping Department until the 2:00 p.m. break and then left work without notifying Valentour or Nino. This left more than 200 mattresses to be packaged, and his supervisors were required to find another employee to finish the job. In his response, the Plaintiff notes that he was sent home early on each of the three days preceding his termination, and that it was not uncommon for him to be sent home at or before 2:00 p.m. He believes that likewise, on February 6, when R. Lopez sent him to the Shipping Department he also told him to leave at 2:00 p.m. He also notes that he was found eligible to receive unemployment benefits because the Defendant failed to provide sufficient information to establish that his discharge was the result of willful misconduct. The Plaintiff's argument suggests that the Defendant applied its expectation regarding his actions on February 6 in a disparate manner. That is, he has presented evidence that it was not unreasonable under the circumstances for him to believe that R. Lopez had the authority to send him home, and that he indeed told the Plaintiff to leave at 2:00 p.m. The elements of his prima facie case are

16

thus closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together. *Faas*, 532 F.3d at 642. "Pretext means a dishonest explanation, a lie rather than an oddity or an error. Pretext is more than a mistake on the part of the employer; it is a phony excuse. Showing pretext requires proof that the defendant's explanation is unworthy of credence." *Id.* (citations, brackets, and quotation marks omitted). According to the Defendant, Valentour terminated the Plaintiff's employment when he walked off the job without notifying Valentour or Nino that he was leaving. The Plaintiff does not dispute that Valentour was the sole decision-maker for his termination. The Plaintiff also admitted in his deposition that Valentour may have honestly believed that he abandoned his job on February 6, 2008. The statements Valentour received from R. Lopez and Nino supported his conclusion that the Plaintiff abandoned his job when he left without approval from the supervisor of the department in which he was working.

The only disputed fact surrounding the Plaintiff's termination from employment is whether R. Lopez told the Plaintiff to leave at 2:00 p.m. when he sent him to report for work in the Shipping Department. But even if R. Lopez told the Plaintiff he could leave, and even if it was reasonable for the Plaintiff to believe that R. Lopez had this authority after transferring the Plaintiff to another department, this would not establish pretext. There is no evidence that R. Lopez indicated to Valentour, the sole decision-maker, that he authorized the Plaintiff to leave at 2:00 p.m., or that the Plaintiff was otherwise acting on R. Lopez's orders. When Valentour asked R. Lopez if he knew where the Plaintiff was because he had not returned from his break, R. Lopez only stated that he had earlier sent the Plaintiff and Reducindo to the Shipping Department to report to Nino. Valentour was also aware when he made the decision to terminate

17

the Plaintiff's employment, that the Plaintiff had not advised Nino that he was leaving at 2:00 p.m. Even if an employer's reason for terminating an employee is "mistaken, ill considered or foolish," pretext has not been shown as long as the employer "honestly believed those reasons." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000); *cf. Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) ("[A]rguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest*.'"(quoting *Gustovich v. AT & T Comm'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (internal citation omitted)). The Plaintiff has not presented any evidence to dispute that Valentour honestly believed that the Plaintiff engaged in conduct for which he could be terminated.

The award of unemployment benefits by the Indiana Department of Workforce Development (IDWD) is likewise not helpful, or even admissible. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 798 (7th Cir. 1997) (explaining that the plaintiff was precluded from using an unemployment compensation determination from an Indiana administrative proceeding to support his assertion that the employer's proffered reason was a pretext for retaliation because the ultimate issue decided in the Indiana proceeding was different from the ultimate issue presented in the retaliatory discharge case and because the allocation of the burden of proof with respect to the underlying facts was significantly different in the two proceedings). The basis of the IDWD's decision, that the Defendant did not establish that the Plaintiff's discharge was the result of willful misconduct, only speaks to the Plaintiff's state of mind (not to the Defendants) and does not mirror the pretext burden at issue before this Court. The Plaintiff has not designated any evidence that calls into question Valentour's sincerity or his good faith belief that the

Plaintiff violated IBC's policies. He provides only his speculation that the Defendant was trying to cover up a retaliatory motive when it terminated his employment for abandoning his job, and a Plaintiff's speculation is insufficient to establish pretext. *Hudson v. WalMart Stores, Inc.*, 412 F.3d 781, 786 (7th Cir. 2005).

For these reasons, the Plaintiff does not raise any issue of material fact with respect to his retaliation claims, and the Defendant is entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, International Bedding Corporation's Motion for Summary Judgment on Roger Twilley's Claims [DE 37] is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on April 23, 2010.

                         s/ Theresa L. Springmann
                         THERESA L. SPRINGMANN
                         UNITED STATES DISTRICT COURT